# Shugard *v.* Union Traction Company, Appellant.

*Negligence—Street railways—Master and servant—Fellow servant—Inspector and contractor.*

When an employer has furnished reasonably safe appliances and made suitable provision for their inspection and repair, his duty is done. He is not liable to an employee for the negligence of another employee who is entrusted with the use or management of the apparatus.

A car inspector who tests an electric car for the purpose of determining the efficiency of its electrical appliances, and not for the purpose of determining the safety of the car, either for the employees, or the public, is while so engaged merely a coemployee of the conductor of the car.

In an action to recover damages for death of plaintiff's husband, a conductor, employed by an electric railway company, it appeared that at the time of the accident, the car had been stopped for the purpose of enabling an inspector to test the electrical appliances to determine whether they would properly utilize the current. The inspection had no connection with the safety of the car either for operators or passengers. While the inspection was going on the motorman stood upon the ground within arm's length of the controller handle, and assisted the assistant inspector in manipulating the controller. The inspector was within the car, and out of sight of the controller. The conductor was also inside the car. When the test was over the inspector signified that the test had been completed, and there was some evidence that he said, " All right, put on your pole." Immediately afterwards the assistant inspector stepped down from the front platform. The motorman was in the act of stepping upon the platform to take his regular place, when the car suddenly started, and ran a distance of its own length, and then stopped. A cry was heard, and the conductor was found lying crushed beneath the end of the car. The deceased had untied the trolley pole from the near platform, as was his custom at this point, had swung the pole around to the other end of the car, and immediately upon its coming in contact with the trolley wire, the car had started and run against him. The only inference to be drawn from the testimony was that the controller had been left open for the reception of the power, since power could only be communicated to the car when the controller was open, and when at the same time the trolley pole was on the trolley wire. *Held,* that it was error to submit the case to the jury.

Argued Jan. 14, 1902. Appeal, No. 327, Jan. T., 1901, by defendant, from judgment of C. P. No. 4, Phila. Co., Dec. T., 1900, No. 517, on verdict for plaintiff in case of Lizzie B. Shugard v. Union Traction Company. Before McCollum, C. J., Mitchell, Dean, Fell, Brown, Mestrezat and Potter, JJ. Reversed.

Trespass to recover damages for death of plaintiff's husband. Before WILLSON, J.

The facts are stated in the opinion of the Supreme Court.

The court refused binding instruction for defendant.

Verdict and judgment for plaintiff for $5,500.    Defendant appealed.

*Error assigned* was in refusing binding instructions for defendant.

*Thomas Leaming*, with him *Charles Biddle*, for appellant.— The cause of the accident was totally unexplained.   The case should therefore not have been submitted to the jury: Alexander v. Pennsylvania Water Co., 201 Pa. 252; Reese v. Clark, 146 Pa. 465; Pittsburg Southern Ry. Co. v. Taylor, 104 Pa. 306; Frazier Bros. v. Lloyd, 23 W. N. C. 178.

There was no negligence by anyone unless the decedent and his motorman were negligent in not adjusting the controller handle before introducing the current.

It has frequently been held that an inference can only be drawn from facts in evidence, and that inferences cannot be drawn from inferences: Douglass v. Mitchell, 35 Pa. 440; McAleer v. McMurray, 58 Pa. 126; Phila., City Pass. Ry. Co. v. Henrice, 92 Pa. 431.

All present were fellow servants: Phila., etc., R. R. Co. v. Hughes, 119 Pa. 301; Reese v. Biddle, 112 Pa. 72; Prevost v. Citizens' Ice and Refrigerating Co., 185 Pa. 617.

*Charles H. Edmunds*, for appellee.—When the deceased surrendered his car to the operators of the testing car it became their duty to do their work in a proper way, and, if negligent during any part of it, whether at the commencement or the conclusion, their negligence is to be charged against the principal: Ricks v. Flynn, 196 Pa. 269; Ross v. Walker, 139 Pa. 49; Lewis v. Seifert, 116 Pa. 647; Penna., etc., Canal & R. R. Co. v. Mason, 109 Pa. 300; Mullan v. Phila. &. Southern Mail S. S. Co., 78 Pa. 25.

The conductor and the inspector were not fellow servants: Fuller v. Jewett, 80 N. Y. 46; Northern Pacific R. R. Co. v. Herbert, 116 U. S. 642; 6 Sup. Ct. Rep. 590; Brann v. Chicago, etc., Ry. Co., 53 Iowa, 595; 6 N. W. Repr. 5.

OPINION BY MR. JUSTICE POTTER, February 24, 1902:

Benjamin F. Shugard, the husband of the plaintiff in ·this case, was a conductor in the employ of the defendant company for a period of over ten years. He was accidentally killed in Germantown upon the afternoon of September 29, 1900, under the following circumstances :

When his car reached the terminus of the line, an inspector of the defendant company was there waiting with a testing car, for the purpose of making an inspection of the electrical apparatus. To facilitate this purpose, the car was stopped by the side of the testing car. The trolley pole was pulled down from the overhead wire, and tied to the rear platform, so as to guard against the admission of any current of electricity from the . overhead wire. The inspector in charge was inside of the testing car. His assistant stepped upon the front platform of the passenger car, bringing with him the end of a wire connected with the testing apparatus. The motorman of the passenger car stepped down upon the ground, but remained standing near the platform.

The sole purpose of the test was to try the electrical connections upon the car, to be sure that they would properly utilize the current. The question of the safety of the car, either for the operators or for passengers, was not an element in this inspection at all. The test consisted in applying a wire, connected with the testing apparatus, to the various notches of the controller box, step by step. As the application to each notch was made, and indicated the proper condition, a bell was rung by the chief inspector, and then the assistant proceeded to turn on another notch by means of the controller handle.

In this instance, according to the testimony, the controller was opened and closed some seven times, and the equipment was found to be in good condition, requiring no adjustment or repair. The test occupied but a few moments of time. The car was not taken away from the motorman or conductor, but was simply halted upon the track. While the test was being made, the motorman was within arm's length of his controller box, and of the controller handle, and actually assisted in opening and closing the cover. The conductor meanwhile, was sitting inside the car looking over his accounts.

There is some evidence to show that upon the completion of

the test, the inspector made use of the expression, "All right, put on your pole," but whether or not he used these words, he undoubtedly did signify that the test had been completed, and was satisfactory. The assistant inspector stepped down from the front platform. The motorman was in the act of stepping upon the platform, to take his regular place, when the car suddenly started, and ran a distance of its own length and stopped. A cry was heard, and the conductor was found lying crushed beneath the end of the car. It was obvious that he had untied the trolley pole from the rear platform, and in accordance with his duty and his custom at this point, which was at the end of the line, he had swung the pole around to the other end of the car, and that immediately upon its coming in contact with the overhead wire, the car had started, and had run against him, knocking him down, and crushing out his life.

It appears from the evidence in the case, and is a matter of common knowledge, that the electrical current which supplies power to the car comes from the overhead wire. It cannot enter the car unless the trolley pole is on the wire, and it cannot enter then, unless the controller is open. The motorman does not state, whether or not he looked at the handle of his controller after the test was finished, and does not state whether the handle was at that time turned so as to open the controller to the reception of the power. The inference is, however, unavoidable that such must have been the fact, for he states that the car started almost instantly when the trolley pole touched the wire.

There is nothing in the evidence to indicate any imperfection in the electrical equipment of the car, for the test had shown that everything was in good shape. The starting of the car must therefore have been the result of mismanagement in its operation, by the men in control. In running the car the motorman was in charge of the controller, and as a consequence regulated the admission of power to the car. The conductor had charge of the trolley pole, and it was his duty to see that it was properly placed in contact with the overhead wire. He was an experienced conductor and was familiar with the operation of the car, and must have known that if by any chance the controller was open, the effect would be to start the car as soon as the trolley pole came in contact with

the overhead wire. He was of course dependent upon the motorman for protection against any misplacement of the controller handle. The motorman was standing just at the edge of the platform where a glance would have shown him the position of the controller handle, but apparently he failed to notice it. He testified that during the course of the inspection the controller had been turned on and off seven times, to admit the current from the testing car. He and the assistant inspector, who was also a motorman, were the only ones who had anything to do with the handling of the controller during the inspection, and they were both standing so close to the controller handle, as to be able to touch it with their hands. At the moment of the accident, the assistant inspector had left the platform of the passenger car, and the motorman was just in the act of taking his regular position at the controller, when through the action of the conductor, contact was made with the overhead wire, and the deplorable result followed.

The trial judge instructed the jury that the case was bare of any evidence of negligence for which the defendant company could be held responsible, unless it were found in the conduct of Branson, the inspector. The court left it to the jury to say, whether or not under the evidence Branson got such indications on his testing machine as would show that the controller was in the proper position when he said, " All right, put on your pole." And said further that if the jury believed that he gave the signal to restore the pole before he received indications that the controller was in the proper position, they might find that there was negligence for which the defendant company was responsible.

We think the learned court misapprehended the testimony in this respect. A careful reading of the evidence upon this point as it is before us, shows that in the position which Branson occupied he could not tell whether the controller was on or off. He was asked: " Q. Does it (the controller) give its own signal when it is thrown off? A. If the hook is not removed from the pole, the needle would go to zero. That would show you that the controller was off. If they removed the hook from the pole, the needle would go to zero also, and you could not tell whether the controller was off or on."

This statement shows that Branson could not know from his

own observation, the position of the controller. His assistant, Plumb, and the motorman of the passenger car could readily see it. Branson denies giving any signal except the one to his helper to throw the controller off, when the test was finished. But even if he did use the words, " All right, put your pole on," the expression was merely an indication that he was through with the test, and that the conductor and motorman might resume the use of the car. But under any aspect of the case, Branson was not acting in the discharge of any duty which the law imposes upon the employer, and therefore cannot be considered as a vice principal.

When the employer has furnished reasonably safe appliances and made suitable provision for their inspection and repair, his duty is done. He is not liable to an employee for the negligence of another employee who is entrusted with the use or management of the apparatus.

As said before, the purpose of the inspection which Branson made was not to determine the safety of the car, either for the employee or the public. He was merely testing the efficiency of the electrical appliances, and while so engaged was merely a coemployee with his fellow workers. It would never do to hold an employer liable to one employee for the negligent, or unskillful use by other reasonably competent fellow workers, of the necessary and reasonably safe tools and appliances which had been furnished. The responsibility for this most unfortunate accident must therefore rest upon those who were coemployees of the deceased. The negligence, if any, was theirs, and nothing is disclosed by the evidence for which the defendant company should be justly held responsible.

The assignment of error is sustained, and the judgment is reversed, and is now entered here for the defendant.